May it please the Court, my name is Ann Voights and I represent defendant-appellant Jazzmon Russell. This Court should reverse Mr. Russell's conviction because from start to finish the District Court prioritized a rapid result over the right one. I'd like to reserve four minutes of my time if I may. Any one of the errors committed at trial warrant reversal of his conviction, combined they require it. And as to Mr. Russell's sentence, because the District Court failed to make any consideration of the 3553A factors, at a minimum Mr. Russell is entitled to resentencing. On appeal, Mr. Russell challenged a trial, the admission of the 911 and dispatcher calls, the evidence of a subsequent offense, the admission of DNA evidence without the Court making a finding of reliability, a finding that this Court has repeatedly said is required, and the giving of an improper Allen charge that stripped away some of the language designed to protect against the coercive effect of giving such a charge. That charge was inappropriate to give at all, but it was particularly inappropriate given the language that was taken out. You raise a number of claims just as you started to, as you've been enumerating. What do you think are your strongest claims? I think the strongest claims, Your Honor, are the recordings, the Allen charge, speaking solely of the trial errors. Are the recordings, the failure to make a finding of reliability as to DNA evidence, and the Allen charge. On the recording, you're talking about when the recording was played in the trial, or when the prosecutor mistakenly, inadvertently, or whatever you want to call it, played parts of the, I forget if it was the 911 call. It was the 911 call, Your Honor. So yes, that is the most glaring error associated with the recordings, but it's certainly not the only one. When I was reading the briefs and looking at what the District Court judge said, because there was an objection, if I remember correctly, or something. There was an objection. And the District Court said, well, it was essentially said, I don't have his exact words, but essentially it was inadvertent, it was minor, there was a lot of other stuff going on. It's unlikely to have caused any prejudice or to make a difference in the outcome. What do you say to that? I would say that the court made no effort to ensure that by giving a corrective instruction, by clarifying what happened, and it's clear that the jury focused on those recordings because they asked for them during deliberations and listened to them again. Moreover, I think... But what they listened to in the jury room wasn't what was played. Wasn't that corrected? It was not, but there was no explanation to them of the difference between the two, or the fact that some part of them... Okay, but just so the record's clear, they did not listen to that in the jury room. Yes. That segment was omitted. It was. It was corrected, but that correction was never made evident to the jury, nor were they told that they could not consider it. And as to the admissions of the recordings entirely, I'd like to point out what the District Court actually said. The court said that all they could do was use it for probable cause, but then didn't actually enforce those limitations. It said that at ER 55. And when pushed, it's clear that the court found that there wasn't personal knowledge, and that's essential to admitting any of it, not just the comment about the handgun, which the government admitted over the... Despite the court's order. But the court actually said, she didn't say she saw him shoot a gun. When the government said, well, it can be inferred, said, yeah, but she didn't say she saw the shooter. When the government said, well, she ID'd the defendant, the court said, as an assumption she made. That's at ER 56. We think that those findings cannot be squared with admitting the recordings at all, but it particularly can't be squared with the government's error and the failure to correct it in a meaningful way. The court should have granted a mistrial. At a minimum, it should have given a curative instruction. And leaving it to the jury to sort of try and figure out simply was... It was a problem. And the fact that the jury asked to hear those recordings again shows how significant they were. So you think this is so prejudicial by itself that merits reversal? Is that your But I think when you combine it with the fact of the admission of those recordings at all, plus the fact that you had the evidence of other acts, you had the evidence of DNA brought in... But the other... In that issue, it's the subsequent incident similar. Yes. That's the one you're talking about there. Is that correct? Yes. So in our view, first, it was error to admit both the 911 call and the dispatcher call, which despite the fact that the court really viewed it as going to explaining why they were there, the government used it for proof. They used it to bolster Officer Tejada's testimony. Officer Tejada testified that the defendant didn't put his hands up immediately, but on cross-examination admitted that he didn't know that the windows were up, that they may have been tinted, that in fact there were photographs showing that the windows were tinted, and that he didn't actually discuss what defendant had been doing with his hands in the police report. So the government then shifted and looked at the dispatcher call and said, well, look, look at what they're saying in that. There, they're saying that he didn't raise his hands. And that was also problematic. Well, what about the guns that were found in the secret compartment of the car? Combining that with... And I'm now thinking about the prejudice side of this. So even if there were some type of error, the discovery of the handguns in the secret compartment, combined with the 2019 incident, why doesn't that allay any prejudice concerns in your mind? Because those other acts of evidence shouldn't have been admitted either. If they were being admitted to show either motorcycle or under your knowledge, it doesn't really prove, given that two years later, he knew about a compartment that was discovered during this search. It doesn't, it's not relevant in the prejudice from it. Why not? You know, the pattern of hiding guns in a particular way in his car, why, you know, because we're looking at that for an abuse of discretion. So why is it an abuse? Because I think in this case, the evidence was undisputed that the officers present at the subsequent incident, one, said that it couldn't be opened from the passenger side, that the factory screws were still there. And while Mr. Russell was the driver in the later incident, he was a passenger in the first. So we think the probative value is minimal, but the prejudice, including the fact that the officer testified that he was on a prostitution detail, the other details that came in, made it deeply prejudicial. And so, and the court never carried out a 403 analysis either. You had, you said another one of your stronger arguments was the Allen, which you called it an Allen charge. Was it really an Allen charge? I think it was, your honor. The fact was the jury had been deliberating the prior afternoon. They deliberated all that morning and gone to lunch. They came back and they said they'd reviewed all the evidence and the instructions and that they were at a standstill. So did they go out that morning to deliberate? That is my understanding. If you look at the transcript, it reflects that they had been, that they had taken their lunch break when they came back with this second note saying that they were at a standstill. I thought the record said they were deliberating for half a day. Is that? I think it's unclear from the record how long they deliberated in the afternoon, the day before. Well, let me ask you this. If, does any instruction telling a jury to go back and deliberate if it's been for a certain short period of time amount to an Allen charge or what makes this one more like an Allen charge? I think this is more like an Allen charge for a couple of reasons. First, the fact is that while the overall time may not seem that long compared to the amount of time that the case took, it was a significant amount of time for the jury to deliberate. They clearly thought through the evidence. They said that they had reviewed it. They said that they'd looked at the instructions and they said that they were at a standstill. And so what the court told them was that they should go back and think about it again. But he didn't repeat the language that I think is so critical. There are three aspects of the model jury instruction that the court admitted. He didn't tell the jury that while their duty, they had a duty to deliberate, it was only if each of you can do so without violating your individual judgment and conscience. The court didn't tell them that you should not change an belief as to the weight or effect of the evidence solely because of the opinions of your fellow jurors or for the mere purpose of returning a verdict. And the court didn't tell them that this was not meant to rush them or pressure them into a verdict. So in a traditional Allen charge situation, the Supreme Court has said it's when the court is urging a minority view to consider the majority view. And we don't have that here either. We don't, but I don't think there's any case that has held that it is required. For example, while it's certainly deemed a factor in the scale of reversal, if, for example, the court knows what the split is and the instruction fields aimed at particular jurors, that doesn't mean that it made it proper here, particularly over the defense's objection. And we think that issue is relevant both because it underscores the prejudice of the other errors at trial and as an independent basis. Well, so assuming we agreed with you that this was an Allen instruction, what made it, what makes it coercive under a totality of the circumstances? The form of the instruction. Because the absence of mitigating language, is that the only thing? No. I think it's also if your court looks at the amount of time that the jury spent. The court's asked to consider the amount of time spent deliberating before, the amount of time spent deliberating after. When did they start deliberating? They started deliberating... Do we know when the judge submitted the case to the jury and the jury went back to deliberate? I don't believe we have a specific time.  No. We know that it was the afternoon before, but I don't know... It was the afternoon before? Yes. So they went into the, they heard argument the afternoon before. Yes. They were fully instructed. Is that right? Yes. The afternoon before, the judge said, okay, now we're in the bailiff, sent them into the jury room, and they began deliberating the night before. Is that your understanding? Yes. I mean, if that's the case, then I don't know where I got the half a day, because that would suggest a full day of deliberations rather than just half a day. I think the half day comes from a statement in the record. Okay. Wait a minute. I'm not quite through. So they go home, apparently end of the day, and there's no verdict that day before. Correct? Is that your understanding? Yes. The judge sends them home and says, no discussion of the case, blah, blah, blah, come back tomorrow morning and resume your deliberations. Then they go back the next day, and they start deliberating again. Lunch rolls around. They're released for lunch with the usual admonitions. Is that your understanding? So I don't believe the admonitions are on the record, but there's a note in the transcript that they were given a lunch break. Okay. And all this business about them not reaching a verdict had not yet arisen. Correct. My understanding is it occurred after. Okay. So they go out and have their lunch. Yes. And they're gone for maybe an hour, hour and a half. Then they come back, go back into the jury room, and they continue to deliberate. Right? And then they send the judge a note. Is that the first note they send the judge? No. They'd send a note earlier. What was the earlier note? That was a note asking to hear the recordings. Okay. They asked to hear recording 10, but heard both recordings, the dispatcher and the 911. In any event, they go to lunch. They come back. Deliberate more? Again, it's unclear from the record, but it appears that it's unclear when the note came out. Okay. So when the note comes out, and then we have this colloquy. Yes. The judge sends them back in. And do we know how long they're back in? It is not in the record. We know that it terminated that day, that afternoon. And that they were scheduled to stop at, I believe, 3.30. But we don't know more than that. Was that the judge's hours for the trial? That is my understanding. In the transcript, it reflects that they were supposed to stop at 3.30. And that counselors would either come back, or they would let the jury go. Let me ask you this. Suppose all of this has happened before lunch. And the judge said, hmm, you're hung. I want you to go out and have lunch. Think about the evidence. Think about the instructions and whatnot. Come back and go into the jury room and continue to deliberate. And then let me know what happened. Were you able to reach a verdict or not? Now, is that an Allen instruction? We use the term Allen loosely. It's kind of a generic term that we use for all these kinds of situations. But would that be problematic on your part? I think it might be. I think what distinguishes... I do that a lot. I'd get jury verdicts. I'd get jury notes that say, we're hung. We can't reach a verdict. And I'd say, well, go home and sleep on it. Is that coercive? I think here what distinguishes it, and the language is at 3 ER 575, is the court said, well, look, this would be too soon to ever declare a mistrial. I'm going to send you back. If it helps, look very, very carefully at the evidence, very carefully at the instructions, and see if that helps. But I'm not going to be declaring... Sorry. But at this time, I'm not going to be declaring a mistrial at this time. So I think, again, I agree the court has used the Allen instruction broadly. We do think that this was coercive and it was inappropriate. Here, it was done over the defense's objection. I see I'm very short on my time. If I might... Well, I want to... I'm sorry. Go ahead. Go ahead. I want to ask one follow-up about this. In fact, the jury did not say it was hung. It said, we are at a standstill. Is that the same thing? As we're hung, we can't possibly make a decision? They said, we're at a standstill, even after discussing and going through all the evidence. So you're saying, with that kind of inquiry, the judge can't say, go back and review all the evidence and the instructions and see if that'll help you? That's improper. Could have if it had included the proper language that would not force a result. I think that that is a different question than the instruction that was given here. If I might raise one point about the DNA, as I see my time is running very short. With respect to the DNA, I just wanted to point out that in this case, it's absolutely clear that the court did not actually make a finding of reliability. This evidence was challenged under Daubert. They raised the NIST draft report that pointed out that there was not enough publicly available data to enable an external independent assessment of reliability. And in this case, and this also goes to the issue of the continuance, the government only disclosed clearly a week before trial, or shortly before trial, that there had been a collision with the samples that compromised the ability to do the analysis. I will submit on the other issues and reserve, I think, 13 seconds. Matt, I want to ask one question about this DNA issue. Did the defense preserve the issue of whether reliance on that software was appropriate? I'm sorry? The software that the expert used? Yes, I think that they did. If the court looks at it, they raised the Daubert challenge and they pointed out, you know, the whole NIST draft report is about the propriety of the software. And they quoted from it in that, and it was CR 115. I believe it was attached as Exhibit 2. And I think the critical language is at page 75, but I won't verify that for the panel. Thank you. Thank you. Good morning, Your Honors. David Freeman with the United States. May it please the court. I'll start by addressing the Allen charge, which is the focus of the defense's argument. In our view, whether this is characterized as an Allen charge or not, it was not unduly coercive, and the district court did not abuse its discretion in giving this instruction. All it said was, look very, very carefully at the evidence, very carefully at the instructions, and see if that helps. That was... A little bit more than that. I believe he went on and said, you've only been deliberating for around half a day, and it's too early to declare a mistrial. But it was... What does that tell the jury? I think it tells the jury they need to deliberate a little bit longer before he's going to declare a mistrial. But it was, I would note, as Judge Sanchez noted, it was less coercive than the model instruction in some ways. The model instruction says, you know, do not change an honest... It says you should not hesitate to reexamine your own views and change your opinion if you become persuaded that it is wrong. And that is somewhat coercive, because it is suggesting that there's a deadlock. The jurors who are disagreeing should change their minds. That was not given here. Do you think the model instruction is a little bit too tough? I don't think it's a little bit too tough. I think this one, you know, it omitted the part that said don't change an honest belief just to reach a verdict. But this Court's instruction didn't say you shouldn't hesitate to reexamine your views. And I think on these facts, what the district court said about the timing was that it had only been around a half a day. Unfortunately, the transcript doesn't have timestamps and the notes don't either. So that's what... Were you the trial counsel? I was, yes. Do you remember? I recall that the jury started deliberating very late on the afternoon of September 29th. They came back that... Fully instructed and they were sent in to deliberate. Yes. It was a full afternoon. There were several witnesses. There was closings. There was then instructions. They then went out for a short period of time. They started deliberating. They came back. They deliberated the entire morning of September 30th. They did have lunch. And then they sent the note, in my recollection, shortly after lunch. They were instructed and a few hours later they came back with the verdict. So I believe it was around half a day and then a few hours after they returned the verdict. What about Judge Lynn's question? Is there a difference between a standstill and jury deadlock in your mind? I think there is. You know, the jury didn't say we... They said they're at a standstill. We've looked through all the evidence. They didn't say we can't reach a verdict. They didn't say there's no further deliberations would be helpful. So I do think in this type of case, it would be appropriate for the judge to say, you know, just try a little bit harder. Look very, very carefully at the evidence. See if that helps. And that's how he phrased it. See if that helps. He didn't say, you know, don't come back until you have a verdict. Well, he already told them that, didn't he, when he was... When he instructed them? In terms of don't change your... Look at... Read all... Consider all the evidence. I mean, there's some general instructions that go in. You know, they're part of every set of instructions about viewing the evidence and considering the evidence. That's correct. But this court has not said it's inappropriate to give this type of instruction, particularly when it's only been a few hours. And I think if you look at the timing here, when they deliberate... What's the best case? What's the best Ninth Circuit case that kind of supports your view that there's nothing coercive about this? I think Doss and Hernandez are the two cases we rely on. And those cases were both very similar. Hernandez actually was another case where, again, the instruction in that case didn't mention... It didn't tell the juries you shouldn't hesitate to re-examine your own views, and this court looked upon that favorably. And I think that instruction was actually a bit more coercive. The judge told the jury, you know, if you don't reach a verdict, we're going to have to have another trial. And I think here that was only implied. He said, you know, it's too early to declare a mistrial. So looking at Doss and Hernandez, both had similar timing, just a couple hours of deliberating before the instruction. And then I believe in those cases it was actually shorter. One of them, the jury came back 40 minutes after. You know, this court said that wasn't coercive, because usually with an Allen instruction, this court is looking for very... More coercive conduct, like where the judge asks about the split, looks into... Asks, you know, what's the divide, or the judge says it's going to be very expensive to hold a retrial. And there was nothing like that here. And ultimately... What if we were to assume that this qualifies as an Allen charge? Generally speaking, I mean, we use the term Allen very loosely. Our case law says, you know, it's kind of a generic term. We just... In these kinds of situations, we call it an Allen charge. What if we were to assume, you know, our case law says you look to several other factors, the text of the... Yes. Words, the... There are two other factors, the time... Yes. Deliberation, there's one other one I can't... I think it's the form of the instruction, the timing, and then other indicia of coerciveness, are the three. So how would you address those issues? Again, I think this... If you characterize this as an Allen charge, which this court could, under those factors, it was not coercive, it was not an abuse of discretion. Again, if you look at... That's why. Because the form of the instruction was neutral. You know, the judge just said, look at the evidence very carefully. And the timing doesn't suggest coercion. With timing, this court is looking for a very long period of deliberation, followed by a short response, you know, an immediate verdict after the instruction. That's not what happened here. There was a half day of deliberations. The jury was out for a couple hours after the instruction. And other indicia of coercion, what Hernandez sort of... Hernandez highlighted was inquiring into the division, because that suggests the holdout should change their mind. Or telling the jury that it's going to be really expensive to hold another child. Doing something that suggests the jury really needs to reach a verdict. And on this record, you know, even if this court might have handled it differently, I don't think it was an abuse of discretion. The judge does have a lot of discretion in this area. If there are no other questions on that, I just wanted to briefly address the mistake, the error that happened in playing the call. I was trial counsel. I made this mistake. We have apologized below. We'll apologize again. But I will say two things about this mistake in playing the 911 call. One is that it was inadvertent. And two, it was harmless. And just on the inadvertent part, the reason this happened, it was, of course, our fault. But this judge is somewhat unique in that he gives you the motion to eliminate rulings right before jury and selection. So we showed up with the recording ready to play. We didn't have time to recut it. During trial, we tried to basically skip past the excluded statement. That's at page 162 of the record. There was a technical error. And we stopped playing the recording as soon as we realized what had happened. What the judge said at page 249 is that it wasn't clear the jury had actually heard the excluded part of the statement. And there was a ruling transcript. And I believe the statement was visible for what he said was a fleeting glimpse on the screen. So they probably... Why not give a curative instruction on top of that? Just say, and by the way, jury, whatever, do not consider that portion. So defense counsel didn't request a curative instruction. And I think this might be a case where giving a curative instruction probably would have highlighted the error for the jury. I'm not sure how we could have given a curative instruction that would have mentioned the statement again and said, you know, you just heard a statement. The defendant, I saw the defendant having a handgun. Disregard that. I think that probably would have made it even more prominent in their minds. But I would note, as Judge Lynn highlighted, that they did ask to hear the recording again during jury deliberations. By that time, it had been properly edited. And at the time it mattered during deliberations, that's what they actually heard. They heard the correct version. And even apart from that, you know, this was a 10-minute call where both victims were saying, you know, the defendant was outside shooting. I've heard two shots. I don't think it's plausible that the reason the jury returned a guilty verdict is because they also heard AA say, I think it's a handgun. I think that would, at most, be harmless. And I would note, the defense did move for a mistrial on this point. And they haven't even challenged that ruling on appeal. They've just sort of packaged this into their general challenge to the recordings. In terms of the other claims, I— The one claim that counsel didn't have an opportunity to address was the argument that at sentencing, the judge didn't really offer any explanation that one could digest and understand how he selected 120 months when defense counsel had argued for, was it, seven years or six years, something like that? By the way, you keep calling that the low end of the guideline in your brief. In fact, that's the guideline, right? It's not the low end. It can't be any higher than that.  To be precise, it was the low end of kind of the first cut at the guideline. But that's not the guideline. I understand. It was the—the stat max here was 120 months, so it was the guideline range. But it was a guideline sentence. This Court has said a guideline sentence does not require much explanation. I will concede there was a very brief, very short, not much explanation here. In our view, the judge did say, you know, that is a maximum. It's a low end term under the guidelines. It's the maximum allowed. Why did he select that? Why did he select that sentence? Well, this—again, it was—it was a guideline sentence. And this Court has said a guideline sentence doesn't require much explanation. It can be inferred from the record. It does. And I think here in context, the judge's explanation was this—this was a case where a sentence below the guideline range was not warranted. And that— But he didn't say that. That's—this is the problem. And we have reversed on—even under plain error as to some basis when there's a total lack of explanation. And—and this is almost just the repackaging of the same point three times that the statutory max is 10 years. There isn't anything else beyond that. Why—why isn't this plainly erroneous? So, in the cases this Court has reversed, I believe Hammonds is one incited in the brief, and I—the other one is Wachnine or Wachnini. In both of those cases, you know, this Court said this was a close call at the third prong on the prejudice prong. But what was missing, what was extra in those cases, was in those cases the district court didn't even articulate the guideline range. So, what this Court said is we—we just have no way to even have any idea why the—why the district court selected this sentence. In here, I—I realize it's not much, but I do think the fact that— You know, what troubled me a little bit, I understand that—that district judges don't have to offer much of an explanation of what they were in the guideline range. And I understand that. That's—that's fine. We've said that. That's okay. But the—but the defense counsel made a credible argument for going beyond—below the guideline range. And what—he had—this fellow had quite a—quite a history. In terms of mitigation and— Yes. Yes. And the judge just—you know, there's no response to that or anything. It's just like dead silence. Well, the district court— And, you know, I know about—you know, he had quite the record. And he had a number of felonies. Never had—apparently, he had never suffered a sentence quite as long as this one. I mean, some explanation, I think, is appropriate and needed. What this Court has said is that if it can look at the record and see that the district court listened to the defendant's arguments and simply didn't find them persuaded—persuasive, that's not an abuse of discretion. And here, this—we know the district court just wasn't—you know, this isn't a case where he just wasn't paying attention because it actually did agree with the defense counsel on several points. Yes. Defense counsel had the mitigating arguments for a below-guideline sentence. He also—there was a guideline dispute. The district court ruled for the defendant on that. There was also an objection to a supervised release condition that was raised for the first time at the sentencing hearing. The district court ruled with the defendant on that as well. And that was—that was a hotly contested issue. So I think looking at this record, you can see the district court was paying attention. It just ultimately didn't decide—didn't—it didn't think that the arguments warranted a sentence below the guideline range for the reasons you were kind of referring to, the criminal history. And this is plain error review. Defendant has the burden to show prejudice. He has the burden to show—the fourth prong is met as well. I would note defense counsel made no attempt to talk about those prongs in the briefing we raised in our answering brief. Still wasn't addressed in the reply brief. And ultimately, defendant has to show there's a reasonable probability that he would have received a lower sentence if the district court had said more on the record. In our view, given the defendant's criminal history, given the serious nature of the offense, this wasn't just, you know, a 922-G where the gun was found in the car. There was a shooting. Given those facts, and given the fact that we know the district court was paying attention, we know the district court ruled for the defendant on certain issues, this court can't find, you know, that there was prejudice. Does the court ruling on those issues suggest that the court was aware of Mr. Russell's background and those mitigating factors that were being advocated for? I mean, so, you know, generally paying attention to things. Didn't he say he'd read everything? He did. He said he'd read the papers as well and he'd looked through everything. And this was a case where defense counsel, as you noted, presented a very fulsome argument in favor of mitigation. The party submitted sentencing positions. So I think this record shows the district court treated this very, treated this issue with care, even if he probably should have said more. But ultimately, the question is, would the defendant have, is there a reasonable probability he would have received a different sentence? I don't think he's met that burden and he really hasn't even tried in his briefing. I want to ask you a question about this expert testimony. So the judge did not find it was reliable, correct? He said she's qualified. He didn't find that the evidence was reliable. He never made that finding.   So this STR mix, the only evidence in the record questions the reliability of that. She says she's used it in her lab. But under those circumstances, this is critically important evidence, isn't it? It is. So isn't he required to make a finding that that STR mix is reliable? So I guess I want to modify my answer. He didn't say there was not an express reliability finding. He didn't say this evidence is reliable, STR mix is reliable, but there was litigation about this before the trial. The defense submitted a motion in limine to exclude the DNA evidence on this basis that STR mix is not reliable and raised some of the arguments that are referenced in his briefing. This was pages 71 to 74 of the supplemental excerpts of record. The government filed a response, you know, arguing that this method is reliable. And it cited, among other things, the Sixth Circuit's decision in Gizantier. And the district court denied that motion before trial. So this was litigated on the papers. There was briefing about this. So in that sense, I don't think this is a case where the district court just abdicated its gatekeeping liability. Did the district court judge just deny the motion? It did, yes. Didn't say, offer any kind of reasoning behind the denial? Didn't. But again, you know, the district court saw these arguments in the papers. And the defendant does have to show prejudice here. And these arguments were presented to the district court, and he rejected them. So I don't think, this is another situation where I don't think saying more would have made a difference. And he, you know, he did also say she qualifies at the hearing. That's different from Rubel-Cabo-Garcia, where the district court, there was no pretrial briefing. And when at trial, the government said, will you qualify this person as an expert? And the district court basically said no. That's for the jury. If the court had found the DNA method unreliable and excluded DNA testimony, how would that affect prejudice analysis? I would say defendant would probably have a strong argument that it was a harmful error. I think it was one of our key pieces of evidence. There were other strong pieces of evidence. We had, you know, the 9-1-1 call, the 4-4-B evidence, the fact that Officer Tejeda also, you know, saw the defendant coming from the shooting and saw his hands by the console. But I don't want to understate. I think it was an important piece of evidence. That's the only thing that puts the gun in his hands. Well, directly in his hands, I suppose. I mean, there was the Coumadin and his medication in the console. He had hidden the gun in another occasion. The AA said that he was outside shooting, even though she didn't directly see it. Officer Tejeda said he had his hands— Are you offering that now as substantive proof that he was shooting that 9-1-1 call? The 9-1-1 call? Yes. Your position is that that's admissible as substantive proof that he was shooting? All right. I apologize. It was admitted for probable cause. But yes, in terms of the other evidence I went through, the Coumadin, the other incident, and the fact that Officer Tejeda saw this kind of suspicious movements. I'm far over my time. If there are any other questions, I'm happy to answer them. Thank you, Your Honors. Thank you, Your Honors. I'll be very brief. If I might begin with addressing the sentencing issues that Judge Paez raised. I think it's simply clear looking at the record that the district court did not consider the 3553A factors. They were vigorously argued by defense counsel. But at the same time, the court made absolutely no findings about that. That's just clear from the record. It's nowhere in there. And there were real reasons why a below-guidelines sentence would have been appropriate here, given the extremely abusive childhood Mr. Russell suffered, given his health conditions that the OP has been unable to care for. The fact that the sentence imposed was multiples of any sentence he'd previously suffered. All of those are reasons that are validly considered under 3553A factors. My only concern about that argument is that I think we have some cases that say, if you can look at the record and sort of surmise reasonably what was motivating the district judge, then we can do that. I think Wachman and Hammonds actually cut the other way and say that you can't. Like, if this court is forced to guess, even if it's pretty sure that it's guessing correctly, Mr. Russell was entitled to hear from the court as to why it was imposing sentences did. And this court has held repeatedly that when it comes to the section 3553A factors— Let me ask you this. Can we infer from the fact that he picked the statutory max that what he was concerned about was the defendant's criminal history record? Which, you know, quite substantial. It may have been, but we just don't know. And that's the problem. That's why this should be remanded for resentencing. Because if this court is forced to guess— You don't think that would be a reasonable inference on our part? I do not. I think that, in this case, there were real reasons to give a below-guideline sentence here. As you asked and just confirmed the court, defense counsel did ask for a sentence of slightly over six years. And there was no explanation given for rejecting that, even though there were valid reasons why that should be considered. I think even the governess conceded that Mr. Russell's childhood was a terrible one. If I might address just one other point with respect to the recordings, I do think it is significant that the government used both the 911 call and the dispatcher call as substantive evidence. It was part of their key evidence, as well as the DNA. I think all of those fall apart. All of those are things that were admitted, and that either, in the case of the recordings, where the court's factual findings can't be squared with the legal conclusions, or the court made no findings at all with respect to Daubert or when it came to the sentencing. Let me ask, I gather the Daubert issue was litigated pre-trial? It was, Your Honor. And what can we take from that? Was there an argument made in the pre-trial motion that the methodology was unreliable? That the evidence was... I did the NIST, and they argued that it should be excluded under Daubert and the federal rules of evidence. Can we take from that that when the district court denied the motion that he did so because he found it reliable? Was that guessing too much? I think, again, it's guessing too much. And this court has held in other instances that what the court needs to do is to make an explicit finding of reliability. What's your best case for that? Rubicalva, Your Honor. Although there are others, as well, that we cite in our brief. And I see that I'm well over my time. I'm certainly happy to answer other questions. Let me see if you have any other questions. Thank you very much. Thank you. I want to thank counsel for their helpful arguments. The matter will stand submitted.
judges: PAEZ, SANCHEZ, Lynn